**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-25-00222-CR**
_____

**CASEY LEON JONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 411th District Court**
**San Jacinto County, Texas**
**Trial Cause No. CR14,077**
_____

**MEMORANDUM OPINION**

A grand jury indicted Appellant Casey Leon Jones ("Jones" or "Appellant") for intoxication manslaughter under Texas Penal Code section 49.08(b), which is a second-degree felony. Tex. Penal Code Ann. § 49.08(b). The indictment alleged that Jones

> on or about the 26th day of February, 2023, . . . , in [San Jacinto] County . . . did then and there operate a motor vehicle in a public place while

intoxicated, and by reason of such intoxication, caused the death of another, namely, Gary Ralph, by accident or mistake.

The jury found Jones guilty of the offense as charged in the indictment. After hearing punishment evidence, the jury assessed punishment at eleven years of confinement. The jury also found that the State proved, beyond a reasonable doubt, that Jones used or exhibited a deadly weapon during the commission of the offense or during immediate flight from committing the offense. The trial court sentenced Jones in accordance with the jury's verdict. Jones timely appealed. For the reasons explained below, we affirm the trial court's judgment.

## Evidence at the Guilt-Innocence Phase of the Trial

### Testimony of Demetress Eldridge

Demetress Eldridge testified that on the day of the car accident in this case, he was traveling home from Baytown at night and saw dust or smoke coming from a car that appeared to have been in an accident and it was off of the road in the woods in Coldspring, near a slight curve in the road. Eldridge testified that the road had no streetlights, and there were no reflectors or light poles near the accident scene. Eldridge recalled that he stopped to render aid, and he observed what appeared to be an "already deceased[]" man in the passenger seat, and no one was sitting in the driver's seat. According to Eldridge, a man he identified at trial as Jones was on the ground outside of the driver's side of the vehicle, and the man appeared to be injured. Eldridge tried to call 911, and other people arrived on the scene and tried

unsuccessfully to render aid and administer CPR to the passenger. Eldridge recalled that he recognized Jones as a childhood neighbor, but that Eldridge had moved to Houston seventeen years ago and he did not think Jones recognized him at the accident scene. Jones asked Eldridge to "get him out of there[,]" but Eldridge testified that he was not willing to "take no one from a crime scene[]" and Eldridge told Jones he was not going to take him from the scene. Eldridge recalled that Jones told him that a car had run him off the road, but Eldridge did not recall seeing another car. DPS, the "San Jacinto County police," and EMS arrived at the scene. Eldridge provided a DPS trooper with his name and driver's license, and the trooper did not get a statement from Eldridge and told him he did not need to stay. Eldridge recalled that he went home and was not involved in the case again until about six months before trial when the prosecutor called him and he was subpoenaed to testify. Eldridge testified that in December of 2024 he had provided a written statement to the district attorney's office.

Testimony of Sarah West

Sarah West testified that on February 26, 2023, she and Sadie Lee were traveling from Coldspring to Crockett when they noticed a two-door sedan had left the road and it was in the treeline off of the road, with smoke coming from the car. According to West, she pulled her vehicle over on the shoulder near the accident, and Lee called 911. West approached the wrecked car at the same time as a young

3

male, and she heard a man, who she identified at trial as Jones, shouting, "don't call 911. Please don't call the law. Oh, God, I got to get out of here." According to West, Jones appeared to be unable to walk, he was bleeding from his head, and he wanted them to give him a ride. She did not get any closer to him because Jones sounded belligerent and upset, and she heard him say "[g]et me out of here[]" more than three times. West recalled that it appeared that Jones was attempting to leave the scene, and that if he could have physically left, he would have. West testified that she saw Eldridge talking to Jones, and she walked to the passenger side of the car and realized there was a passenger. She and others that had arrived on the scene determined that they should pull the victim out of the car to perform CPR, but he was already deceased. West recalled that during the entire time she was on the phone with 911 trying to get guidance on rendering aid to the passenger, Jones was on another phone trying to get someone to hurry and come get him. She did not check on Jones's welfare because she was afraid to do so. According to West, the vehicle smelled of alcohol. When she asked Jones if there were any children in the backseat of the vehicle, he said, "No, I don't have any kids, you f[@#$]ing b[@#$%]." West recalled that prior to coming to the location of the accident, she did not see any other vehicle ahead of her and she never saw anything that indicated that Jones was run off the road by another car. Law enforcement arrived, and West reported that the passenger was non-responsive and that the driver appeared to be attempting to flee

4

the scene. Law enforcement informed West and Lee they were free to leave and they left.

Testimony of Sadie Lee

Sadie Lee testified that she and West saw a car in the treeline, the car was smoking from the front, and they stopped to render aid. According to Lee, by the time West made it across the street, there was already someone over there and West yelled for Lee to call 911. West appeared upset and called Lee over to her because she was not sure what to do about Jones. Lee recalled that Jones told her and West that he was the only person in the accident and that he "just need[ed] to get the F out of [there]." When Lee opened the passenger door, she noticed an unresponsive person in the passenger seat. Lee testified that West got on the phone with 911 and Lee overheard Jones calling people and telling them to come get him and that he was right down the road. Lee observed that Jones was injured and unable to get up, and she focused on rendering aid to the passenger. Lee described Jones's demeanor as "[a]ggressive[,]" and she heard Jones say at least once that he did not want to go to jail, and she heard him say more than five or six times that he wanted to get out of there. According to Lee, she did not get "super close[]" to Jones, but she could smell alcohol. Lee testified that any car that would have potentially run Jones off the road would have been traveling in front of her and West, but that just prior to encountering the wrecked car, she did not see any other vehicles or headlights or taillights on that

5

road in the vicinity of the accident. Lee testified that once the deputy showed up, Lee reported to the officer that one person at the scene was trying to flee, and one person was nonresponsive in the car. After she and West left the scene, they stopped at the bar Shifters, around a mile from the accident scene, to wash blood off her hands. A recording of Lee's 911 call was admitted into evidence and published to the jury. Lee recalled that she and West stayed around for a while in case law enforcement needed their statements, but law enforcement then instructed them to leave. She testified that the accident was in 2023, but she had only provided a statement to the district attorney's office after she was contacted in December of 2024.

Testimony of Trooper Leonel Pizano

Trooper Leonel Pizano with the Texas Department of Public Safety testified that he responded to a car accident on public roadway 156 in San Jacinto County. Photographs from the accident scene were admitted into evidence and published to the jury. Redacted recordings from Trooper Pizano's dash camera from when he responded to the accident and recordings from his body camera at the scene were admitted into evidence, and a portion of the redacted video recording from Pizano's body camera was published to the jury. According to Trooper Pizano, when he arrived, he found Jones on the ground complaining about his hip, saying he was unable to walk, and bleeding from the head, and Pizano found another individual on

6

the passenger's side of the vehicle who was on the ground and who was pronounced deceased at the scene. Jones told Pizano that a car had run him off the road causing him to crash into a tree. Pizano testified that he was certain that Jones was intoxicated after hearing Jones's slurred speech, smelling a strong odor of alcohol from Jones's breath, and observing Jones's glassy eyes. He also observed an open, half-full 12-ounce bottle of Bud Light that was still cold to the touch right next to Jones, and Jones stated he drank two beers at Shifters. According to Pizano, in his experience, most people underreport how much alcohol they consumed when asked, and almost every time they tell Pizano that they drank two beers. Trooper Pizano explained that he did not administer field sobriety tests on Jones because he was injured. Trooper Pizano recalled that he took over the accident investigation from the Sheriff's department and that he learned that some civilians that had stopped to render aid had already been dismissed from the scene. Pizano determined from the markings at the scene that Jones did not use his breaks, and that based on that and the signs of intoxication that Pizano had observed, he believed that Jones had consumed more than two beers. EMS arrived and transported Jones to the hospital. The deceased man's son found out about the accident and arrived at the scene, and Pizano informed the son that his father had been involved in a wreck and had passed away. When the son found out that Jones was the driver, the son wanted Pizano to prosecute Jones, and Pizano explained that Jones was not arrested at the scene because of his

condition and that he was being transported to the hospital. Pizano stated in his report that Jones's unsafe speed had also contributed to the accident, Pizano agreed that Jones was driving intoxicated regardless of who else was on the road, and Pizano believed that intoxication played a major factor because it affected Jones's ability to maneuver his vehicle.

Testimony of Sergeant Gary Wright

Sergeant Gary Wright with the Texas Department of Public Safety testified that he reviewed Trooper Pizano's crash report and the crash packet. Sergeant Wright agreed with Pizano that Jones's unsafe speed while entering the curve was a contributing factor to the accident, and that Jones left the roadway and entered the ditch. Wright was also able to get evidence from Shifters, the bar where Jones said he had been drinking prior to the accident. Sergeant Wright explained how ingesting alcohol diminishes judgment and reaction time. Wright testified that field sobriety tests would not be possible or accurate if the person completing the tests was unable to walk, and he explained that field sobriety tests are usually not performed when there has been a car crash because the driver could have sustained a head injury that could affect the accuracy of the tests. According to Sergeant Wright, in cases like this where the driver is transported to the hospital, DPS can subpoena the medical records to determine whether the driver was intoxicated. Sergeant Wright recalled that the airbag control module was not obtained from the car because it would not

8

have provided any additional information because it was obvious that the car left the roadway. Sergeant Wright testified that, based on his experience and his review of the crash report, the investigative report, and Sergeant Stanton's accident reconstruction diagram, along with the receipts from Shifters, the hospital lab report, and the video of Trooper Pizano talking to Jones, it was Sergeant Wright's opinion that intoxication was a contributing factor to the accident. Sergeant Wright agreed on cross-examination that he could not say for sure whether there was another car that caused Jones to leave the roadway.

Testimony of Dr. Baiyang Xu

Dr. Baiyang Xu, a forensic pathologist, testified that he works for Forensic Medical Management Services in Beaumont, which contracts with small nearby counties to perform autopsies. According to Dr. Xu, Dr. Armstrong performed the autopsy on the decedent, Gary Ralph, on February 27, 2023. When the district attorney's office reached out to the facility regarding this case, Dr. Xu was asked to review Dr. Armstrong's work and arrive at an independent conclusion based on his review. Dr. Xu concluded that Gary Ralph died from "mass bleeding due to . . . aorta dissection[,]" and Dr. Xu agreed with Dr. Armstrong's determination of Gary Ralph's cause of death as blunt force injuries of the torso and head from the car accident. Dr. Armstrong's autopsy report was admitted into evidence.

9

The trial court admitted State's Exhibit #59, Jones's medical records from the night of the accident, into evidence over Jones's objection.[1] The medical records indicate that Jones's alcohol concentration at the time of the hospital testing was 301 mg/dl. Dr. Xu testified that he had only seen one or two pages of Jones's medical records an hour before his testimony and that he was not testifying as to the chain of custody, he did not know the hospital's procedure for blood draws or for testing the blood, and he was not present during the blood draw. Dr. Xu testified about the blood alcohol results shown in Jones's hospital records from the night of the accident and that the records indicate that Jones's alcohol level was three times the legal level.[2]

Testimony of Sergeant Allen Stanton

Sergeant Allen Stanton with the Texas Highway Patrol is trained in intoxication and accident reconstruction, and he testified that the results from his

---

[1]State's Exhibit #59 includes a business records affidavit with the attached medical records. The defense objected to the admission of State's Exhibit #59 as follows: "Sixth Amendment confrontation [and] hearsay within hearsay[.]" Defense counsel also argued that medical records are hearsay and that "[y]ou get through one level of hearsay with a business records affidavit, but you still have to have someone testify and interpret the records in order to aid the jury[,]" but that Dr. Xu had no personal knowledge of how the tests were conducted or about the chain of custody.

[2]Jones again objected to Dr. Xu's testimony regarding the blood test results based on Jones's Sixth Amendment right of confrontation and arguing Dr. Xu had no personal knowledge about who drew the blood, whether it was drawn from Jones, the hospital's procedure for the blood draw, and the chain of custody of the blood. The State responded that "[a]ll that goes to the weight not the admissibility[]" and that Dr. Xu was subject to cross-examination.

10

investigation of the accident in this case were logged into a computer program which generated an accident reconstruction report. The report was admitted at trial as State's Exhibit #31. He explained based on his experience and training, how the car that was driven by Jones traveled during the wreck, that Jones had failed to let off the gas, failed to gain control, and instead had made "faulty corrections[]" resulting in the crash. According to Stanton, an intoxicated driver can be a contributing factor to a crash because intoxication causes "thought processes [to] go down," and faulty decisions and actions and "maneuvering when [the driver] probably had a better option to stop whatever event has already started to happen."

Testimony of Connie Rogers

Connie Rogers testified that she and her husband own Shifters bar. According to Rogers, in February of 2023, law enforcement retrieved evidence from Shifters in this case. The video footage from the security cameras at Shifters from February 26, 2023, that Rogers provided to Trooper Pizano and Investigator Tracy Galloway in this case, was admitted into evidence and published to the jury. Rogers also provided Trooper Pizano and Sergeant Wright the Shifters bar receipts for the ticket name "Casey" which show the drinks ordered at the bar on Casey's ticket on February 26, 2023, and those receipts were admitted into evidence and published to the jury. Rogers identified Jones at trial and testified that she knew him. She testified that she saw him at Shifters on February 26, 2023, and he hugged her, and there was no other

11

"Casey" besides Casey Jones who was at the bar that night. Rogers explained that the receipts for Jones's tab at Shifters on February 26, 2023, reflect that eight Corona Extras, among other drinks, were ordered, and she testified that Jones, and no one else, drank the eight Corona Extras. Rogers testified that the bar receipts and the security videos would not support Jones's claim that he only had two beers that night. Rogers testified that Jones also bought other drinks for other people that night. According to Rogers, the receipts show that after Jones closed out his tab at 8:37 p.m. that night, the security video shows a car pulling onto the public roadway twenty-four minutes later and no other cars passed by around that time. Rogers recalled that Gary Ralph arrived at the bar around 3 or 4 p.m. that day and he also hugged her, and she could not remember if Jones was already at the bar when Gary Ralph arrived. She recalled that Gary Ralph and Jones were together at one point that night, and that Hadley Soucier and Angie Soucier were also at the bar that night.

Testimony of Jeff Williams

Jeff Williams testified that he was the EMT that responded to the accident scene, and his ambulance was dispatched at 9:08 p.m. According to Williams, the passenger was already deceased when they arrived. The driver, Jones, was unable to stand, and requested that he be helped into the passenger seat of another person's car so he could leave. The ambulance report was admitted at trial, and it states: Jones refused assessment, treatment, and transport despite complaining of excruciating

12

pain; he reported having two beers, and he stated that a car had tried to cut him off and he lost control and hit a tree head-on. According to the report, Jones was agitated, medical control was contacted, and sedation was ordered for Jones, and ultimately Jones consented to medical treatment and transport.

Testimony of Hadley Soucier

Hadley Soucier testified that prior to the accident, he was friends with Jones and he and Gary Ralph would hang out with Jones. Around the time of the accident, Jones had allowed Hadley to live with him while Hadley was going through a divorce with Angie. According to Hadley, on the day of the accident, he had a few drinks early in the day at Shifters, went to Jones's house and had a few beers with Jones and Angie until almost dark, and then Hadley and Jones rode on separate motorcycles to Shifters, and Angie drove her car there. Gary Ralph showed up and drank with them and then left and Hadley thought Gary Ralph was asleep in his truck. Sunny Ray Merrell[3] and a few other people joined them at Shifters. Hadley recalled having a "few" beers with Jones, they did not count how many beers they consumed, and Hadley thought he had ten beers throughout the day and that Jones typically drinks at about "the same speed[]" as him. According to Hadley, near

---

[3]The official Texas Peace Officer's Crash Report is attached to DX3 (Defendant's Exhibit #3), and it shows that the Honda Civic being driven by Jones at the time of the accident was owned by "Merrell, SonnyRay Mosley[.]" In the transcript from the trial the owner of the vehicle is spelled as "Sunny."

closing time, the bar ran out of cold beer and Jones got upset and loud. Hadley recalled that Jones wanted to continue the party at his house, but Sunny refused to let Jones take her car and Hadley refused to let Jones drive his motorcycle because Jones had consumed too much alcohol and Hadley was "afraid he'd wreck it or hurt himself." Hadley watched Jones leave the bar but did not know where he was going. Hadley recalled that about fifteen or twenty minutes later, he received a call from Jones who said, "Come get me, I don't want to go to jail." When Hadley asked where he was, Jones told him that he was down the road, and Hadley and Angie went in her car to the scene. Once Hadley and Angie arrived at the scene, Jones had already been transported from the scene and Hadley realized Gary had left with Jones in Sunny's car and that Gary Ralph was deceased. Hadley went to Gary Ralph's son's house to tell him about the accident because Hadley and Gary were close friends. Hadley testified that Gary's son went to the scene and Hadley went to get his motorcycle from the bar and went home. Hadley recalled that sometime later that night, Jones came back home on crutches, had been crying, and went to sleep. According to Hadley, after that, he moved back in with Angie and never talked with Jones again.

Testimony of William Ralph

William, Gary Ralph's son, testified that Hadley and Angie came to his house and were beating on his front door and screaming because they were upset about an

14

accident with a fatality. William recalled that he went to the accident scene and learned from a State Trooper that his father Gary Ralph had passed away in the accident.

Testimony of Julie King

Julie King testified that she was the only bartender working at Shifters on the date of the accident, she has bartended for about twenty years, and she knew Jones. King reviewed the security camera videos from that night. According to King, Jones arrived at Shifters sometime after 3 p.m. and played pool with some other people. King recalled that at some point Jones left and came back to the bar. King testified that the receipts showed that Jones closed out his tab at 7:00 p.m., and that she recalled that he had not left at that point. She stated that Jones closed out another tab at 7:16 p.m. and his last tab at 8:37 p.m. King testified that she served Jones ten beers that day, and that nine were paid on his tab that day over six hours, and one was paid for by Jones's friend, Gary Ralph, in cash. King recalled that Jones drank Corona Extra that day and that he got upset when she ran out of cold Corona Extras. King then served him a Corona Premier instead and Jones took a sip of it, did not like it, and knocked it over so he did not drink the rest. King recalled that she served Gary one Miller Lite and that the eight Shiner Bocks on one of the tabs were served to another person. She did not see Jones or Gary leave. King's daughter called her shortly after 9 p.m. and told King to be careful on her way home because there was

15

a wreck down the road from the bar. King testified that Sadie, who would come to the bar every now and then, stopped at the bar and was upset after seeing the wreck, and she asked if she could use the bathroom to wash her hands. According to King, Jones "didn't appear to be drunk when he left. Or throughout the day."

Evidence at the Punishment Phase of the Trial

Testimony of William Ralph

William, Gary's son, testified as to how his father's death affected his family and how arriving at the accident scene affected him. William testified that he did not believe Jones should get probation because that would be "a slap on the wrist."

Testimony of Emily Hardy

Emily Hardy with the San Jacinto County Adult Probation testified that on October 6, 2020, Jones was placed on probation for assault family violence. According to Hardy, there were at least two motions to adjudicate Jones's guilt, but his probation was not revoked despite Jones admitting he had used alcohol multiple times and testing positive for alcohol in violation of his probation conditions.

Testimony of Sadie Lee

Lee testified that since the accident on February 26, 2023, she has seen Jones drinking alcohol a few times at Shifters and once at the American Legion. Photographs that Lee testified she took and texted to Gary's son that depicted Jones drinking at those two beers on those occasions were admitted at trial.

16

Testimony of Trooper Lindley Koonce

Trooper Lindley Koonce with the Texas DPS testified that on July 20, 2019, he assisted a traffic stop in San Jacinto and Jones was arrested for driving while intoxicated.

Testimony of Detective Joshua James

Detective Joshua James with the Madisonville Police Department testified that on January 1, 2020, he responded to a call regarding a fight, and Jones and others were intoxicated at the scene and Jones had to be handcuffed at the scene for safety reasons. According to James, he observed an injury to one of the females at the scene who reported being injured by Jones during a fight.

Testimony of Officer Daniel Kee

Officer Daniel Kee testified that on November 8, 2019, while working for the Groveton Police Department, Jones called 911 for help because he had run out of gas. Officer Kee responded to the call for a welfare check. According to Officer Kee, Jones was outside of his vehicle and appeared to be intoxicated. Officer Kee recalled that Jones was ultimately arrested for public intoxication instead of driving while intoxicated although "common sense will tell you he drove that car there." The booking photograph of Jones was admitted into evidence.

Testimony of Lieutenant Nathan Deweese

Lieutenant Nathan Deweese testified that in 2021 a report was made to him by a female victim alleging domestic violence had been committed against her. State's Exhibit #64, photographs taken during investigation of the report, was admitted in support of this testimony. After Deweese testified, the State rested its case on punishment. Before the defense called its witness, the defense moved to strike Deweese's testimony because of a lack of a link of the alleged offense to Jones. Jones asked the trial court to grant a mistrial or, in the alternative, instruct the jury to disregard Deweese's testimony. The trial court granted the motion and instructed the jury to disregard Deweese's testimony and ruled that State's Exhibit #64 would no longer be part of the record.

Testimony of Symore Croxton

Symore Croxton testified as a witness for the defense. She testified that she considered Jones like a father because he raised her even though he was not her biological father. According to Croxton, she watched Jones grieve Gary's death, and she testified as to the pain Jones experienced because of Gary's death. Croxton explained that it would devastate her if Jones went to prison for a long period of time.

Issues on Appeal

In issue one, Appellant argues that the trial court violated his Sixth Amendment right to counsel by denying Appellant's voir dire questions pertaining to the State's burden of proof that he caused the victim's death by reason of Appellant's intoxication. In his second issue, Appellant contends the trial court violated his right to counsel under the Texas Constitution by denying Appellant's voir dire questions pertaining to the State's burden of proof that he caused the victim's death by reason of Appellant's intoxication. In issue three, Appellant argues the trial court committed reversible error by allowing that part of State's Exhibit #59 that reflected Appellant's blood test results because there was no proof regarding the chain of custody. In issue four, Appellant argues that the trial court violated Appellant's Sixth Amendment right to confront witnesses by allowing the witness, Dr. Baiyang Xu, to testify regarding the blood test results reflected in State's Exhibit #59. In his fifth issue, Appellant asserts that the trial court committed reversible error at the punishment phase of trial by failing to promptly strike Deweese's testimony.

Analysis

Trial Court's Denial of the Defense's Voir Dire Questions

In issues one and two, Jones argues that the trial court committed reversible error under the Texas and United States Constitutions when it disallowed defense counsel to question the jury panel about the State's burden to prove that Jones's

19

intoxication caused Ralph's death. Jones relies on the following exchange during

voir dire:

> [DEFENSE COUNSEL]: [PROSPECTIVE JUROR] No. 13, is it possible for someone to be intoxicated, driving, in a car accident, and not be at fault in that accident?
>
> [PROSECUTOR]: And, Judge, I respectfully object to that being an improper commitment question.
>
> THE COURT: Sustained.
>
> [DEFENSE COUNSEL]: Let me ask it this way. Auto accidents happen every day, yes?
>
> PROSPECTIVE JUROR NO. 13: Yes.
>
> [DEFENSE COUNSEL]: Sober, drunk, accidents every day, right[?] So it's possible to wreck a car and not be drunk, right?
>
> [PROSECUTOR]: Respectfully object to improper commitment question.
>
> [DEFENSE COUNSEL]: What am I committing them to?
>
> THE COURT: Response?
>
> (Bench conference recorded)
>
> [PROSECUTOR]: She's adding extra facts to the question about not being drunk and about causing a wreck. Because the addition of those facts committing them to a particular result. And under [*Standefer*], it's an improper commitment question.
>
> [DEFENSE COUNSEL]: I'm not - -
>
> [PROSECUTOR]: Presupposes additional facts about not being drunk or about causing an accident.

20

[DEFENSE COUNSEL]: I'm asking for her opinion about - -

[PROSECUTOR]: Getting a commitment.

. . .

[PROSECUTOR]: Getting a commitment to a particular extra set of facts not being drunk, being drunk, whatever.

THE COURT: Sustained.

(Bench conference concluded.)

Jones indicates in his brief that his "focus" on appeal is on the question asking Prospective Juror 13 whether it is "possible for someone to be intoxicated, driving, in a car accident, and not be at fault in that accident?" Jones argues this question was proper because it sought to determine whether venire members would require the State to prove each element of the offense of intoxication manslaughter, including that Ralph's death was caused by Jones's intoxication.[4] According to Jones, any prospective juror indicating an unwillingness to require the State to prove causation would have been challengeable for cause, and by denying defense counsel the ability to question the venire on this issue, the trial court violated Jones's constitutional rights to counsel and an impartial jury since defense counsel was unable to make intelligent challenges for cause and peremptory challenges. Jones argues the trial

---

[4]A person commits the offense of intoxication manslaughter if the person: "(1) operates a motor vehicle in a public place, . . . and (2) is intoxicated and by reason of that intoxication causes the death of another by accident or mistake." Tex. Penal Code Ann. § 49.08(a).

21

court's ruling was "especially important" because there was evidence at trial that Jones was forced off the road by another vehicle, both the State and the defense discussed the evidence of causation repeatedly during closing arguments, and the trial court included the lesser-included offense of driving while intoxicated in the jury charge at the guilt-innocence phase.

The State responds that the trial court did not abuse its discretion in sustaining objections to the defense's voir dire questions because they attempted to improperly bind the venire to a specific fact scenario by asking if an intoxicated driver could be involved in a wreck without being at fault. The State contends that (1) a commitment question is improper if it asks a prospective juror to resolve an issue a certain way after learning a particular fact; (2) a commitment question is improper if it adds more facts than necessary to establish a challenge for cause; (3) proper questioning must focus on whether a venire panel can convict if every element is proven beyond a reasonable doubt, without adding hypothetical parameters; and (4) the defense failed to preserve its constitutional complaint because the objection was an objection to the form of the question and the defense did not rephrase the question and instead moved to a different topic.

"We consider the voir dire as a whole when determining whether a question constitutes an improper commitment question." *Adams v. State*, Nos. 09-15-00328-CR, 09-15-00329-CR, 09-15-00330-CR, 09-15-00331-CR, 09-15-00332-CR, 2016

22

Tex. App. LEXIS 12261, at *26 (Tex. App.—Beaumont Nov. 16, 2016, no pet.) (mem. op., not designated for publication). The trial court has broad discretion over the voir dire process, and we leave to the trial court's discretion to determine the propriety of a particular question and do not disturb that decision absent an abuse of discretion. *Fuller v. State*, 363 S.W.3d 583, 585 (Tex. Crim. App. 2012). "A trial court's discretion is abused only when a proper question about a proper area of inquiry is prohibited." *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). The area of inquiry is proper if the question "seeks to discover a juror's views on an issue applicable to the case." *Id.* "The State's burden of proof is an issue applicable to any criminal case[.]" *Woolridge v. State*, 827 S.W.2d 900, 904 (Tex. Crim. App. 1992). We agree with Jones that defense counsel's question was designed to explore whether Prospective Juror 13 would require the State to prove not only that Jones was driving while intoxicated but also that Jones's intoxication actually caused Ralph's death. This is a proper area of inquiry since causation is one of the elements of the offense, an element which is not satisfied by proof of intoxication alone. *See* Tex. Penal Code Ann. § 49.08(a) (listing elements); *Hanna v. State*, 426 S.W.3d 87, 98 n.57 (Tex. Crim. App. 2014) (citing intoxication manslaughter as an example of an offense in which "proof of the defendant's intoxication is not equivalent to proof of causation[]"). As the Court of Criminal Appeals held long ago,

> Intoxication at the time and proof by the State, or finding by the jury under the court's instruction, that there was a death will not in that

23

abstract form support a conviction. The death must be the result of the intoxication and proof must be made and submitted to the jury of that thing which worked a causal connection between the intoxication and the death.

*Long v. State*, 214 S.W.2d 303, 304 (1948). *See also Daniel v. State*, 577 S.W.2d 231, 233 (Tex. Crim. App. 1979) (citing *Long v. State,* 214 S.W.2d 303 (1948)); *Matamoros v. State*, 500 S.W.3d 58, 65 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) ("The State was required to prove that appellant's intoxication, and not just his operation of a vehicle, caused the fatal result."); *Wooten v. State*, 267 S.W.3d 289, 295 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) ("It is not enough that operation of a motor vehicle, even when operated by an intoxicated person, causes death; rather, the State must prove that a defendant's intoxication caused the fatal result."). As the trial court would later instruct the jury, "[N]o person may be convicted of an offense unless the state proves each element of the offense beyond a reasonable doubt." Therefore, so long as the questions were properly worded, defense counsel was entitled to ask questions seeking to discover whether prospective jurors would require the State to meet its burden to prove each element of the offense of intoxication manslaughter, including that Jones's intoxication caused Ralph's death. *See Barajas*, 93 S.W.3d at 38.

A question that touches on an area of proper inquiry is nevertheless improper "if it attempts to commit the juror to a particular verdict based on particular facts." *Barajas*, 93 S.W.3d at 38; s*ee also Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim.

24

App. 2001) (a commitment question asks prospective jurors "to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact[]"). Although Jones's appellate briefing appears to concede that defense counsel's question was a commitment question, the record does not reveal that Prospective Juror 13 was ever asked to commit to finding Jones guilty or not guilty depending on whether a particular fact was or was not proven. Nor did defense counsel isolate a particular fact seeking "to gauge its impact on the venire panel." *See, e.g., In re Commitment of Smith*, 422 S.W.3d 802, 808 (Tex. App.—Beaumont 2014, pet. denied) (citing *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 756–57 (Tex. 2006)). Instead, Prospective Juror 13 was asked whether it is possible for an intoxicated driver to be involved in an accident without being at fault. Although the State was not required to prove Jones was "at fault" for the accident, we construe "fault" in the context in which it was used by defense counsel to refer to a driver's responsibility for causing an accident. Answering "Yes" to the question would have indicated Prospective Juror 13 was open to the possibility that an intoxicated driver's involvement in an accident may not equate to the driver's being responsible for causing the accident, but it would not have committed Prospective Juror 13 to acquitting Jones.

But even if the question could be considered a commitment question, our inquiry would not end there, because "[n]ot all commitment questions are improper." *Standefer*, 59 S.W.3d at 181. The purpose of prohibiting improper

25

commitment questions is "to ensure that the jury will listen to the evidence with an open mind—a mind that is impartial and without bias or prejudice—and render a verdict based upon that evidence." *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005). "An improper commitment question attempts to create a bias or prejudice in the venireman before he has heard the evidence, whereas a proper voir dire question attempts to discover a venireman's preexisting bias or prejudice." *Id*. Defense counsel's question did not ask Prospective Juror 13 to make up his or her mind before hearing evidence; to the contrary, the question sought to determine whether Prospective Juror 13's mind was open to the possibility that an intoxicated driver may be involved in, but not responsible for, an accident. To the extent the question sought to commit Prospective Juror 13 to keeping an open mind on an element of the offense, such a commitment question is not improper. *See id*.; *see also Standefer*, 59 S.W.3d at 181 ("When the law requires a certain type of commitment from jurors, the attorneys may ask the prospective jurors whether they can follow the law in that regard.").

"[F]or a commitment question to be proper, one of the possible answers to that question must give rise to a valid challenge for cause." *Id.* at 182. Here, a "No" answer to defense counsel's question may have indicated that Prospective Juror 13 did not believe that the State needed to prove that Jones's intoxication actually caused Ralph's death so long as the State proved that Jones was driving intoxicated

26

and was involved in an accident in which Ralph died. Although such an answer, standing alone, may have been insufficient to disqualify Prospective Juror 13, defense counsel was entitled to ask proper questions introducing the topic before asking more specific questions designed to discover whether a prospective juror's beliefs rose to the level of "a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely[.]" *See* Tex. Code Crim. Proc. Ann. art. 35.16(c)(2) (providing the standard for a valid challenge for cause by a defendant). The law applicable to the case upon which Jones was entitled to rely requires the State to prove causation with evidence that goes beyond the defendant's mere involvement in an accident while driving intoxicated. Defense counsel's voir dire question was designed to discover whether Prospective Juror 13 may have been subject to a challenge for cause for refusal to hold the State to its burden to prove each element of the offense.

Lastly, "the question should not contain more case-specific facts than needed to give rise to a valid challenge for cause." *Braxton v. State*, 226 S.W.3d 602, 605-06 (Tex. App.—Houston [1st Dist.] 2007, pet. dism'd). Here, the question did not do so. It asked Prospective Juror 13 whether it was possible for a person to be: (1) intoxicated, (2) driving, (3) in an accident, and (4) not at fault. The trial would involve evidence regarding each of these facts, and including each of the facts in the

27

question was necessary in order to explore whether Prospective Juror 13 had an open mind on the element of causation.

Because defense counsel's question touched on an area of proper inquiry, did not seek to commit Prospective Juror 13 to a particular verdict, was designed to explore whether Prospective Juror 13 was subject to being challenged for cause, and did not include unnecessary facts, we conclude that the question was proper and that the trial court abused its discretion when it sustained the State's objection and disallowed the question. *See Barajas*, 93 S.W.3d at 38.

Next, we must consider whether the trial court's error was harmful. Both the Texas and United States constitutions protect a criminal defendant's rights to counsel and an impartial jury. *See* Tex. Const. art. I, § 10; U.S. CONST. amend. VI. These rights have been construed to include "the right to question veniremembers in order to intelligently exercise peremptory challenges and challenges for cause." *Linnell v. State*, 935 S.W.2d 426, 428 (Tex. Crim. App. 1996). Although some cases rely on the defendant's right to counsel as the source of the right to question the venire, "it was the right to a speedy and public trial by an impartial jury embodied both in the federal and Texas Constitution that this Court identified as the most pertinent to jury selection." *Easley v. State*, 424 S.W.3d 535, 539 (Tex. Crim. App. 2014).

Relying on *Linnell* and similar authorities, Jones argues the trial court's ruling amounted to constitutional error which would require reversal of Jones's conviction unless we were to "determine[] beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *See* Tex. R. App. P. 44.2(a). But in the years since *Linnell* was decided, the Court of Criminal Appeals has clarified that a trial court's erroneous ruling on a voir dire question does not necessarily amount to constitutional error. *See Easley*, 424 S.W.3d at 538. Here, Jones has not demonstrated that his constitutional right to an impartial jury was impacted by the trial court's ruling. Only Prospective Juror 13 was asked the question at issue on appeal. The record does not indicate that defense counsel attempted to ask any of the other prospective jurors the same or similar questions, nor did defense counsel request on the record that she be allowed to do so. The record also does not reveal whether Prospective Juror 13 became one of the jurors. On this record, Jones has not demonstrated that the jury consisted of any members whom defense counsel was prevented from questioning whether it was possible for an intoxicated driver to be involved in an accident and not be at fault. Because Jones's right to an impartial jury is not implicated in this case, we evaluate harm under Rule 44.2(b) which requires us to disregard any error that does not affect substantial rights. *See* Tex. R. App. P. 44.2(b).

Here, the record indicates defense counsel was allowed to ask Prospective Juror 13 and the panel as a whole other questions to explore the prospective jurors' opinions on the issue of causation. In response to defense counsel's questioning, Prospective Juror 13 acknowledged that "[a]uto accidents happen every day[]" and that "kids, animals [and] dogs[]" can distract a person while driving. Other jurors mentioned "videos" and "food" as possible distractions. Defense counsel also secured an affirmative response from the entire panel when she asked whether the panel understood that the State was required to prove that the accident "must be due to intoxication, not anything else." The State had already informed the jury panel that the State was required to prove each element, specifically including causation. The State's burden to prove each element of the offense was also reiterated several times in the court's charge.

Additionally, the evidence of causation was substantial. *See Easley*, 424 S.W.3d at 542-43. The collision occurred because the vehicle Jones was operating left the roadway and hit a tree. Although Jones claimed at the scene that another car ran him off the road, Eldridge, West and Lee all testified to the absence of another vehicle that could have done so. Trooper Pizano and Sergeant Wright both agreed that Jones's intoxication contributed to causing the collision, and Sergeant Stanton reconstructed the accident and testified that Jones's intoxication affected Jones's decision-making and ability to maneuver his vehicle, leading to "faulty corrections"

30

which resulted in the crash. Accordingly, we conclude that the trial court's error in sustaining the State's objections to defense counsel's questions to Prospective Juror 13 was harmless.

We overrule issues one and two.

Trial Court's Admission of Evidence of Blood Test Results

In issue three, Jones argues the trial court committed reversible error by allowing that portion of State's Exhibit #59 that reflected Jones's blood test results because there was no proof regarding the chain of custody of the blood sample drawn and later tested.[5] Specifically, Jones argues that because the State failed to present testimony about the beginning and end of the chain of custody and any testimony from any individual at the hospital as to who drew the blood, the qualifications of that person to draw blood, the procedure used in drawing the blood, and the qualification of the individual and equipment used to evaluate the amount of alcohol in the blood, and any testimony that the blood was taken from Jones. In issue four, Jones argues the trial court violated Jones's Sixth Amendment right to confront witnesses by allowing the witness, Dr. Baiyang Xu, to testify regarding the blood test results that are reflected in State's Exhibit #59. According to Jones, the blood test results in State's Exhibit #59 are hearsay and testimonial because the records

_____

[5]On appeal, Jones states that initially he objected to the entirety of State's Exhibit #59 but then he narrowed the objection to the portion of the records dealing only with the blood test results.

31

reflect that Jones was in an automobile accident and any objective witness would believe that the blood alcohol results would be available for use at a later trial when an intoxicated driver is involved. Jones also asserts that there was a conflict in the evidence regarding his intoxication because Julie King did not believe Jones was intoxicated that day and the prosecutor emphasized the blood test evidence during closing argument.

We need not decide whether the trial court erred in admitting the portion of State's Exhibit #59 relating to the blood test results or in admitting Dr. Baiyang Xu's testimony regarding the blood test results because we conclude that any error was harmless. *See* Tex. R. App. P. 47.1. Generally, the erroneous admission of evidence is non-constitutional error subject to a harmless error analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998); *see also* Tex. R. App. P. 44.2(b) (Other than a constitutional error, "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Jones argues that the standard under Rule 44.2(a) applies because the admission of the evidence violated his Sixth Amendment right of confrontation. *See* Tex. R. App. P. 44.2(a) ("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the

court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.").

The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. In *Crawford v. Washington*, the Supreme Court held that a defendant's right to confrontation under the Sixth Amendment is violated when a witness is permitted to relate out-of-court "testimonial" hearsay statements unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. 541 U.S. 36, 59 (2004). A statement is testimonial if it was made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Id.* at 52. If the primary purpose of the statement is something other than to further a criminal prosecution, "the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination." *See Michigan v. Bryant*, 562 U.S. 344, 361 (2011). Business records are generally not testimonial because they are created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). Medical records prepared for the primary purpose of treatment are not testimonial. *Id.* at 312 n.2; *see Bowlin v. State*, No. 03-21-00372-CR, 2022 Tex. App. LEXIS 5856, at *27-28 (Tex. App.—Austin

Aug. 12, 2022, no pet.) (mem. op., not designated for publication); *Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.—San Antonio 2009, pet. ref'd); *Smith v. State*, No. 05-09-01408-CR, 2011 Tex. App. LEXIS 5990, at *6 (Tex. App.—Dallas Aug. 2, 2011, pet. ref'd) (mem. op., not designated for publication).

Jones was transported to the hospital for treatment of his injuries, and State's Exhibit #59 contains Jones's hospital records from the night of the accident. It also includes a business records affidavit.[6] The medical records show the medical treatment provided to Jones on the night of the accident. Nothing in our appellate record suggests that the blood draw and toxicology information contained within State's Exhibit #59 was prepared by the hospital for criminal investigative purposes. As such, we apply Rule 44.2(b) of the Texas Rules of Appellate Procedure to determine whether the alleged error requires reversal and not Rule 44.2(a).

Pursuant to Rule 44.2(b), an error is not reversible error unless it affects a substantial right of the appellant. *See* Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *See Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). Substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, the appellate court has fair

---

[6]On appeal, Jones does not argue that State's Exhibit #59 did not meet the business records exception to the hearsay rule.

assurance that the error did not influence the jury or had only a slight effect. *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In conducting a harm analysis under Rule 44.2(b), appellate courts should consider the testimony, any physical evidence admitted, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence, the jury instructions, parties' theories of the case, closing arguments, voir dire, if applicable, and whether the State emphasized the error. *Id.* at 355-56. The State may prove a person was intoxicated in either of two ways. *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003). The State may prove intoxication by proof that the defendant's blood alcohol content exceeded the maximum limit, or the State can alternatively prove intoxication through evidence that the accused has lost the use of his mental or physical faculties. *See Derichsweiler v. State*, 359 S.W.3d 342, 347 (Tex. App.—Fort Worth 2012, pet. ref'd). The jury charge here provided both definitions as alternatives for the jury to consider in finding the element of intoxication.

Trooper Pizano testified that he was certain that Jones was intoxicated after hearing Jones's slurred speech, smelling a strong odor of alcohol from Jones's breath, and observing Jones's glassy eyes. He also observed an open and half-full 12-ounce bottle of Bud Light that was still cold to the touch right next to Jones, and Jones stated he drank two beers at Shifters and had only eaten a sandwich earlier in

the day. Trooper Pizano explained that he determined from the markings at the scene that Jones did not use his brakes, and that based on that and signs of intoxication that Pizano had observed, he believed that Jones was intoxicated and had consumed more than two beers. The jury heard Pizano testify that he believed that intoxication played a major factor because it affected Jones's ability to maneuver his vehicle. Sergeant Wright testified that, based on his experience and his review of the crash report, the investigative report, and Sergeant Stanton's accident reconstruction diagram, along with the receipts from Shifters, the hospital lab report, and the video of Trooper Pizano talking to Jones, it was Sergeant Wright's opinion that intoxication was a contributing factor to the accident. Connie Rogers, one of the owners of Shifters who knew Jones, testified that the receipts for Jones's tab at the bar on February 26, 2023, reflected that the bar sold Jones eight Corona Extras, among other drinks, and she testified that Jones, and no one else, drank those eight Corona Extras. The jury saw the tab receipts that were admitted at trial. Rogers also testified that the bar receipts and the security videos would not support Jones's claim that he only had two beers that night. Hadley also testified that he recalled having a "few" beers with Jones, they did not count how many beers they consumed, and Hadley thought he had ten beers throughout the day and that Jones typically drinks at about "the same speed[]" as him. Hadley refused to let Jones drive the motorcycle because Jones had consumed too much alcohol and Hadley was "afraid he'd wreck it or hurt himself."

36

King, the only bartender at Shifters on the day of the accident, testified that she served Jones ten beers that day. During closing arguments, the prosecution and the defense both mentioned Pizano's testimony about signs of Jones's intoxication that Pizano observed.

We conclude that, considering the entire record, any error in admitting, over the defense's objections, the blood test results in State's Exhibit #59 or Dr. Baiyang Xu's testimony regarding the blood test results did not have a substantial or injurious effect on the jury's verdict and did not affect Jones's substantial rights. *See Schmutz*, 440 S.W.3d at 39; *Motilla*, 78 S.W.3d at 355; *Derichsweiler*, 359 S.W.3d at 346-47. Accordingly, even assuming without deciding that the trial court erred in overruling the objections and admitting the evidence in question, we find it was harmless and disregard it. *See* Tex. R. App. P. 44.2(b). We overrule issues three and four.

Deweese's Testimony of Extraneous Offense During Punishment

In issue five, Jones argues the trial court committed reversible error at the punishment phase of the trial by failing to "promptly strike" the testimony of Nathan Deweese, and therefore, Jones is entitled to a new punishment hearing. According to Jones, "it was only after the State rested its case that the trial court finally agreed to the request by defense counsel to strike the testimony and evidence introduced through Deweese[,]" and "by allowing the State to continue with Deweese's testimony for some time after the testimony should have been excluded made it

impossible for the jury to ignore this evidence when assessing Appellant's punishment."

During the punishment phase, Deweese was asked about a domestic abuse incident that Jones allegedly committed against a female victim and about what was marked as State's Exhibit #64, purportedly showing photographs of the victim's injuries. The defense made several objections to the testimony and the failure of the State to show the alleged injuries were caused by Jones. The trial court sustained several objections but gave the State some room to obtain testimony from Deweese to connect the alleged offense and injuries to Jones. After Deweese testified, the State rested its case as to punishment, and, before the defense called its witness, the defense moved to strike Deweese's testimony and asked the trial court to grant a mistrial or, in the alternative, instruct the jury to disregard Deweese's testimony. The trial court granted the motion and instructed the jury to disregard Deweese's testimony and ruled that State's Exhibit #64 would no longer be part of the record.

We review the trial court's decision to admit the extraneous offense evidence for an abuse of discretion. *Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996). During the punishment phase, the State may offer evidence as to any matter the court deems relevant to sentencing, including evidence of extraneous offense or bad act that is shown beyond a reasonable doubt to have been committed by the defendant or for which he could be held criminally responsible. Tex. Code Crim.

Proc. Ann. art. 37.07, § 3(a)(1). As a general rule, error in admitting improper evidence may be cured by a withdrawal of the evidence and an instruction to disregard. *See Waldo v. State*, 746 S.W.2d 750, 752 (Tex. Crim. App. 1988). In extreme cases, an instruction to disregard is insufficient where it appears the evidence is clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced in the minds of the jurors. *Id.* An appellate court presumes that the jury obeyed the instruction given by the trial court. *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987). In determining whether a jury instruction is sufficient to cure the error, the facts of each case must be considered. *Gonzales v. State*, 685 S.W.2d 47, 49 (Tex. Crim. App. 1985).

Here, the trial court sustained some of the defense's objections when the State on direct attempted to connect Jones to the offense, and the defense also cross-examined Deweese and Deweese agreed that he did not see any indication in the reported incident of who caused the injuries to the victim. Despite defense counsel's argument during Deweese's direct examination that Deweese was unable to connect Jones to the offense, the trial court had broad discretion in controlling the mode and order of interrogation of witnesses and the presentation of evidence and we cannot say the trial court abused its discretion in allowing the State an opportunity to connect Jones to the offense. *See* Tex. R. Evid. 611; *Dang v. State*, 154 S.W.3d 616,

39

619 (Tex. Crim. App. 2005). After the State failed to link the domestic abuse evidence to Jones, and the defense made a motion to strike the evidence, the trial court promptly granted Jones's motion to strike the testimony, the trial court instructed the jury to disregard Deweese's testimony, and the trial court struck State's Exhibit #64 from the record. We presume the jury obeyed the instruction given by the trial court.

The jury heard punishment evidence of Jones's other arrests for public intoxication and driving while intoxicated, alcohol use in violation of probation conditions, his continued drinking since Gary's death, and testimony regarding Jones's violent behavior, which could all be considered when considering the range of punishment, and the jury assessed eleven years of confinement when the range of punishment was two to twenty years. *See Gonzales*, 685 S.W.2d at 49-50 (eleven-year sentence out of a possible twenty years was evidence the jury followed the court's instruction to disregard); *see also* Tex. Penal Code Ann. §§ 12.33 (second-degree felony carries punishment range of two to twenty years, plus a fine of up to $10,000), 49.08(b) (intoxication manslaughter is a second-degree felony). We overrule Jones's fifth issue and conclude he is not entitled to a new punishment hearing.

40

Having overruled Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.


KENT CHAMBERS
Justice

Submitted on July 1, 2026
Opinion Delivered August 12, 2026
Do Not Publish

Before Johnson, Wright and Chambers, JJ.

CONCURRING OPINION

I agree with the result reached by the majority but write this concurring opinion because I cannot agree with that part of the majority's analysis in issues one and two wherein the majority concluded that the trial court erred in sustaining the State's objections to certain questions posed by defense counsel to Juror 13.

A trial court has broad discretion over the voir dire process, and we leave it to the trial court's discretion to determine the propriety of a particular question and do not disturb that decision absent an abuse of discretion. *Fuller v. State*, 363 S.W.3d 583, 585 (Tex. Crim. App. 2012); *Barajas v. State*, 93 S.W.3d 36, 38-39 (Tex. Crim. App. 2002) (A trial court retains discretion to restrict voir dire questions that are confusing, misleading, vague, and broad, or are improper commitment questions.). A trial judge must determine if a hypothetical question is being used to explain the law or to commit the venire to any specific facts of the case. *See Atkins v. State*, 951 S.W.2d 787, 790 (Tex. Crim. App. 1997). Based on this record, I conclude the trial court did not abuse its discretion in sustaining the State's objections to the form of the questions.

Additionally, where the trial court has not placed an absolute limitation on the substance of an appellant's voir dire question, but merely limits a question due to its form, the appellant must attempt to rephrase the question or risk waiver of the alleged voir dire restriction. *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex. Crim. App.

1

2012); *Leal v. State*, No. 03-11-00298-CR, 2014 Tex. App. LEXIS 1990, 2014 WL 709550, at \*5 (Tex. App.—Austin Feb. 21, 2014, no pet.) (mem. op., not designated for publication) ("When a trial court sustains an objection to a question but does not impose an absolute limitation on defense counsel's right to question prospective jurors about a particular subject matter, the defendant's right to voir dire examination is not improperly restricted."); *see also Bolden v. State*, 73 S.W.3d 428, 431 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (concluding that because counsel failed to rephrase question and continue line of questioning but instead chose to move on to different topic, appellant waived any complaint regarding disallowed question).

I conclude that the trial court's ruling was within the zone of reasonable disagreement, or alternatively that the defense attorney waived the complaint by failing to rephrase the question. Accordingly, I would overrule issues one and two for those reasons. That said, for the reasons explained in the Majority, I also agree that the error, if any, from the exclusion of the objected-to-questions was harmless. *See Easley*, 424 S.W.3d at 542-43.

LEANNE JOHNSON<br>
Justice

Concurrence Delivered
August 12, 2026

2